IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 3, 2024 Session

## STATE OF TENNESSEE v. BOBBY NEIL MATHIS, JR.

**Appeal from the Circuit Court for Madison County**
**No. 21-552    Donald H. Allen, Judge**

———————————————————

## No. W2022-01588-CCA-R3-CD

———————————————————

A Madison County jury found Defendant, Bobby Neil Mathis, Jr., guilty as charged of one count of rape of a child and one count of continuous sexual abuse of a child. The trial court merged the two counts and sentenced Defendant to thirty years in the Tennessee Department of Correction. On appeal, Defendant argues he is entitled to a new trial because the State failed to elect offenses for the two counts presented to the jury, the trial court erred in failing to issue a modified unanimity instruction, and the evidence was insufficient to sustain the jury's verdicts. After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which J. ROSS DYER and JOHN W. CAMPBELL, SR., JJ., joined.

David W. Camp (on appeal) and Marcus A. Lipham (at trial), Jackson, Tennessee, for the appellant, Bobby Mathis.

Jonathan Skrmetti, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Jody S. Pickens, District Attorney General; and Matthew A. Floyd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Background

In October 2021, a Madison County Grand Jury returned an indictment charging Defendant with rape of a child (Count 1) and continuous sexual abuse of a child (Count 2).

The time frame alleged in Count 1 was between "on or about March 10, 2021, through March 20, 2021[.]" The time frame alleged in Count 2 was between on or about May 2020, to March 2021.[1] During part of the time of the offenses, Defendant lived in Madison County with the victim and several of her family members.[2]

The evidence produced at trial established that the female victim in this case was born on March 5, 2010. At the time of these offenses, she lived in a house with her mother, O.G. The victim's sister, who is three years older than the victim, also lived in the house. The victim's aunt, R.D. (O.G.'s sister), also lived in the house with Defendant. R.D. and Defendant were in a relationship at the time of the offenses, and shared a son, S.M., who is three years younger than the victim. Although S.M. and the victim are cousins, their relationship at that time was closer to that of brother and sister. The victim, her mother, and her sister moved into the house with her aunt and cousin in April 2020, and Defendant moved into the house a month or two later. Defendant, who was in the Army at that time, left the house shortly after moving in to serve in Afghanistan, and he returned to the house in October 2020. At the time of the events described in this opinion, Defendant, the victim's aunt, and the victim's cousin lived downstairs in the house, while the victim, her mother, and her sister lived upstairs.

## II. Trial Testimony

The victim's trial testimony described the family background set forth above. She recalled that on March 22, 2021, her mother brought her to the Madison County Child Advocacy Center (CAC), where she was interviewed by forensic examiner Bethany Edge. The video recording of this interview was introduced at trial.

During the interview, the victim said that Defendant, whom she called "her brother's father" and "Bobby," had "touched" her on more than one occasion. In describing the most recent incident, which she said occurred about a week before the interview, the victim said she was hungry, so she went to a freezer located downstairs but found nothing to eat. Before she could return upstairs, Defendant grabbed the victim, took her into his room, and locked the door. When the victim asked Defendant why he had locked the door, he did not

---

[1] The indictment originally alleged that the continuous sexual abuse occurred "on or about May 2019 to March 2021." However, prior to trial the State moved to amend the indictment as to Count 2, and after a hearing, the trial court entered an order changing the initial date from May 2019 to May 2020. The resulting time frame after the trial court's order would be on or about May 2020 to March 2021 as to Count 2.

[2] To protect the identity of the victim and her family, the victim will be referenced as "the victim," and her family members—some of whom were juveniles at the time of these offenses—will be referenced by their initials.

- 2 -

respond but put the victim on his bed and removed her clothes.  He also removed his own pants and underwear.  According to the victim, Defendant "put his hand down there"; she clarified that Defendant placed his finger inside her vagina and moved it around.  During the interview, she moved her finger in a side-to-side manner to show how Defendant moved his finger.  The victim claimed this activity hurt her.  She also said that during this time, Defendant rubbed his penis with his other hand and made noises.  The victim said she screamed for her cousin and sister, who were upstairs at the time, but they could not hear her.  Defendant stopped his activity once the victim told him she was hurting.  After he stopped, both he and the victim put on their clothes.  The victim then ran out of Defendant's room and locked herself in her room.  She told the interviewer that Defendant did not say anything during or after the incident.

Ms. Edge then asked the victim about the first time Defendant had done something to her.  The victim said that the first time something happened, she was ten years old; she told the examiner that she thought the event occurred in the fall, but the victim could not recall the exact date.

During the recorded interview, the victim stated that on this first occasion, the victim went downstairs to retrieve shoes for her cousin.  She went into her aunt and Defendant's bedroom; Defendant, who was on the couch in the living room area outside his bedroom, followed the victim into the bedroom and kissed her on the lips.  Defendant did not touch the victim's private parts, but he did put the victim "on the wall" and positioned his arms against the wall in a manner which prevented her from leaving.  The victim said that her mother and aunt were not home, but her sister and cousin were home.

The victim was reticent to discuss other incidents with the forensic interviewer, but the victim eventually relented.  The victim recalled that on another occasion, when only the victim and her sister were at the house with Defendant, the victim was lying under the covers of her bed watching videos on her phone when Defendant entered the room and asked her what she was doing.  The victim responded that she was watching videos. Defendant then placed his hands down the victim's shirt and squeezed her breasts underneath her clothing.  The victim told the Defendant to stop because it hurt, but Defendant continued squeezing her breasts.  The victim again told Defendant to stop, which prompted her sister, who was in her room near the victim's, to call out, "Stop screaming!" Defendant then stopped squeezing the victim's breasts and left the victim's room.

The victim described another occasion Defendant had abused her.  While she was unsure of the date, and said it possibly could have been spring 2019, she said it was a Saturday morning when she was still ten years old.[3]  The victim went downstairs to retrieve

---

[3] The victim turned ten years old on March 5, 2020.

snacks for her cousin from Defendant's bedroom closet. The victim's mother and aunt were not at home during this occasion. The victim went into the closet and Defendant followed her. The victim told Defendant that she did not see the snacks, at which point Defendant started "fake punching" the victim. She tried to back away but fell onto Defendant's bed. Defendant then removed the victim's pants and underwear and put his finger inside her vagina. She explained that during this incident Defendant moved his finger "in a circle." The victim told the examiner that she told Defendant to stop several times; he initially "kept going," but he eventually stopped. The victim then replaced her clothes and went upstairs to be with her sister and cousin.

On another occasion, at which time the victim said she was ten years old, the victim went into Defendant's bedroom closet to retrieve cookies. Defendant entered the room behind her and pushed her onto the bed. The victim tried to leave, but Defendant grabbed the victim's hand and forced it onto what she called "his middle part." During her testimony, the victim acknowledged that when she referenced Defendant's "middle part," she meant his penis. She said that she touched Defendant outside his clothes and he did not move her hand after he placed it on his penis. At some point, she removed her hand, got off the bed, left the room, and went upstairs.

The forensic interviewer ended the interview by confirming with the victim the following chronological sequence of events: (1) Defendant's forcing the victim against the wall and kissing her; (2) Defendant's grabbing the victim's breasts; (3) Defendant's touching the victim's vagina; (4) Defendant's forcing the victim to touch his "middle part"; and (5) Defendant's touching the victim's vagina while he simultaneously touched his penis.

After the State played the recording of the forensic interview, the victim testified that on March 21, 2021, a birthday party for the victim's sister was held at the victim's house. The victim, her mother, her sister, and Defendant were present along with several other family members who did not live at the house, including another one of the victim's aunts, C.F. Several of the victim's cousins and extended family members also were there. R.D. was not present for the party because she had been admitted to a hospital. At one point, C.F. and O.G. left the house to pick up food for the birthday party. While these adults were gone, the victim told S.M. about Defendant's abuse. Although the victim asked S.M. not to tell anyone else because she was scared, S.M. told A.F., another one of the victim's cousins, about the victim's allegations. A.F. then asked the victim if the allegations were true, and she said yes.

The victim testified that once the three adults returned, A.F. tried to tell the victim's mother about the allegations, but she was on the telephone. A.F. then told his mother, C.F., who then asked the victim to go on a walk with her.

While C.F. and the victim were on their walk, they discussed the Defendant's abuse of the victim. C.F. told the victim that "everything was going to be okay[.]" C.F. then called O.G. and relayed what the victim had told her. After the victim and C.F. returned to the victim's home, the victim spoke with her mother about Defendant's abuse. This prompted O.G. to confront Defendant, who said the victim was lying. When Defendant called the victim a liar, she began to cry. O.G. then called the police, who came to the house and arrested Defendant.

When the victim was asked whether Defendant "started touching" her a month or two after he moved into the house, she replied, "Maybe so." She testified that she and Defendant had a "normal, regular" relationship apart from the sexual abuse. She denied that she would get angry if Defendant told her to do something and denied being a liar. She acknowledged that at Defendant's preliminary hearing, she testified that during one episode of abuse she had yelled out for her sister, and the sister told her to "shut up." The victim also acknowledged that at the preliminary hearing, she testified she was afraid to tell her sister about Defendant's actions because the victim was afraid her sister would not believe her. The victim also denied telling the pediatrician who conducted the physical examination which followed the forensic interview that Defendant "did stuff" to the victim daily or telling her that Defendant put his "middle part" inside her "middle part."

A.F., who was fifteen years old at trial, testified that on March 21, 2021, he and his mother, C.F., went to the victim's house for the birthday party. At some point during the day, S.M. told A.F. about the victim's allegations. This prompted A.F. to speak with the victim about what happened; after reviewing a statement he gave to police, A.F. recalled that the victim told him that Defendant had touched her "below area and her upper area." After speaking with the victim, A.F. told his mother about the victim's allegations. C.F. then went for a walk with the victim. A.F. testified that once his mother and the victim returned, the victim's mother began yelling at Defendant. A.F. recalled that Defendant then asked the victim for a hug, and the victim responded by screaming at Defendant.

C.F. also recalled attending the birthday party at the victim's house on March 21, 2021. She testified that she had left the house for a while after the party began, but when she returned to the house, S.M. and A.F. approached her car and spoke with her. C.F. then called the victim outside and the two went on a walk, during which they discussed the victim's allegations against Defendant. C.F. described the victim's demeanor during the walk as upset, noting that the victim's "eyes were watering." When they returned home, O.G. came outside the house, and the victim told her mother about Defendant's abuse. The three then returned to the house, at which point O.G. "confronted" Defendant. During the verbal confrontation, the victim expressed "this God-awful scream," unlike any C.F. had heard from the victim. At one point, Defendant asked the victim to give him a hug, which

led to more screaming from the victim. This prompted C.F. to tell Defendant that "he needed to leave," at which point Defendant went to another part of the house.

O.G. testified that during the time between Defendant's moving into the house and the day of his arrest, there were times when Defendant would be left alone with the children, based on O.G.'s and R.D.'s respective work schedules. She recalled hosting a birthday party for her older daughter on March 21, 2021. At one point during the party, she, C.F., and C.F.'s husband left the home for about an hour. Upon their return, O.G. received a phone call from R.D., who was in the hospital. While O.G. was on the call, C.F. took the victim on a walk. Once C.F. and the victim returned, they told O.G. about the victim's accusations against Defendant. This led O.G. to confront Defendant, who kept "shaking his head, no, . . . and he was saying, no[.]" At one point, Defendant asked the victim for a hug, which led the victim to start "hollering" and "screaming." The victim also accused Defendant of lying when he denied anything had happened. O.G. said the police were then called.

O.G. testified the victim had never had any behavioral problems and did not lie. O.G. also testified that the victim had never made accusations of inappropriate conduct against anyone before lodging the allegations against Defendant.

Defendant became a witness on his own behalf, and testified that he had served in the Army in Afghanistan for six years before moving in with the victim and her family. He said that he moved into the house in May 2020, while on leave. He returned to Afghanistan in June 2020, and served there until October 4, 2020, at which point he returned to the house where the victim lived. He testified that in 2020 he had his gall bladder removed and had contracted Covid-19 in January 2021, both of which left him with physical limitations.

Defendant claimed he treated the victim "like a daughter" and denied committing the alleged offenses. He said the victim and the other children in the house "could go throughout the house anytime they wanted to," and the victim often went downstairs, where Defendant's room was located, to do homework. Defendant denied ever having any confrontation with the victim's family before March 21, 2021, and he was unaware of any reason why the victim's mother or other family members would lie. He said that the victim often would "rebel" against him and that he would "have to tell her more than once to do something, and I feel like she didn't like it." He testified that during the birthday party, he asked the victim to pick up "dog poop" from the floor, and he claimed this request made the victim "visibly upset[.]"

When asked why he asked the victim for a hug after she had accused him of sexual abuse, Defendant responded, "I just wanted to see the reason why she was making the

- 6 -

allegations and just wanted her close to me and just to look at me and tell me that she was accusing me[.]" He added that he was "shocked and didn't understand why [the victim] was making the allegations[.]" He stated that he had "never seen her act this way before" she made the allegations. During Defendant's testimony, he denied the victim's allegations, stating, "I'm no molester. I'm not that person."

Defendant acknowledged he weighed 262 pounds as of trial and was significantly larger than the victim. He testified that while in the Army, he and his fellow soldiers "were taught to defend" themselves. When asked whether it would be difficult for him to hold down the victim, Defendant replied, "A person with—the size differences, it shouldn't be."

Dr. Lisa Piercey, a pediatrician and child abuse examiner who at the time of trial also served as the Commissioner of the Tennessee Department of Health, testified for the defense. She examined the victim on March 25, 2021. Dr. Piercey interviewed the victim as part of the examination; the pediatrician testified that during the interview, the victim stated that Defendant "would do stuff to me about every day when my mom and my aunt went to work. He would call me down to his room, start touching on me[,] and put his middle part inside mine." The victim claimed that Defendant said "there would be consequences" if she told anyone about Defendant's actions. The victim told Dr. Piercey that the abuse happened "a lot of times," but the victim was unable to say when the abuse started other than stating that the abuse may have started the summer before the interview. However, according to Dr. Piercey, the victim "was sure that the most recent incident was the Wednesday prior on March 17th."[4]

Dr. Piercey testified her physical examination of the victim was "consistent with her explanation" of what occurred. The physician found no vaginal bruising, but she explained that "[i]n about 85 percent of cases of known vaginal penetration, there are absolutely no physical findings whatsoever." Dr. Piercey acknowledged that there was no way to determine, based on her physical examination, when any penetration took place, stating that with genital injury, "Just like anywhere in the body, once it's healed . . . you can't determine timing based on examination alone."

Dr. Piercey tested the victim for several sexually transmitted diseases, but all tests were negative. The pediatrician said that DNA would not be "indicated" in this case because the victim's last reported sexual activity was more than seventy-two hours before the examination.

---

[4] This court takes judicial notice of the March 2021 calendar and observes that March 17 was the Wednesday the week prior to the forensic interview.

At the close of the proof, neither the State nor Defendant's trial counsel discussed electing offenses, nor did the trial court address the issue. The jury found Defendant guilty as charged on both offenses; as stated above, the trial court merged the counts into a single conviction for continuous child sexual abuse and imposed a thirty-year sentence.[5] This timely appeal followed.

## III. Analysis

## A. Election of Offenses

Defendant argues his right to a unanimous verdict was violated because the State failed to elect offenses at the close of its case in chief. The State argues that "no election of offenses was necessary in this case."

Although not addressed by either party, we note that Defendant did not raise the issue at trial and did not assert the issue in his motion for new trial. Thus, the issue is waived. *See* Tenn. R. App. P. 36(a); *State v. Walker*, 910 S.W.2d 381, 386 (Tenn. 1995). "When a defendant raises an issue for the first time on appeal, the issue will generally be deemed waived and will be considered only within the limited parameters of an appellate court's discretionary plain error review." *State v. Banks*, 271 S.W.3d 90, 119 (Tenn. 2008) (citations omitted). This court will grant relief under plain error only if an appellant can establish all of the following:

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is necessary to do substantial justice.

*Id.* (internal quotation omitted) (citing *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). "Because each factor must be established, [an appellate court] need not consider all five factors when a single factor indicates that relief is not warranted." *State v. Fayne*, 451 S.W.3d 362, 372 (Tenn. 2014) (citing *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007)). "An error would have to [be] especially egregious in nature,

---

[5] Defendant does not challenge his sentence on appeal.

striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006).

Here, the record clearly establishes what occurred in the trial court, as neither the parties nor the trial court discussed the election issue. Nor did Defendant's trial counsel move to compel the State to elect offenses at any time. However, Defendant cannot otherwise establish he is entitled to plain error relief.

"Questions regarding jury unanimity generally arise in cases where the prosecution presents evidence to the jury that tends to show more than one criminal offense, but the underlying indictment is not specific as to the offense for which the accused is being tried." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999) (first citing *State v. Brown*, 762 S.W.2d 135, 136-37 (Tenn. 1988); and then *Burlison v. State*, 501 S.W.2d 801 (Tenn. 1973)). "When the State adduces proof of multiple instances of conduct that each match the allegations contained in a single charged count, the State, at the close of its case-in-chief, must 'elect' the distinct conduct about which the jury is to deliberate in returning its verdict on the relevant count." *State v. Smith*, 492 S.W.3d 224, 232-33 (Tenn. 2016) (citations omitted). "The most important reason for the election requirement . . . is that it ensures that the jurors deliberate over and render a verdict on the same offense." *State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000).

In this case, although the victim testified about four separate instances of sexual abuse committed by Defendant, the State was not required to elect offenses. Count 1 of the indictment, charging Defendant with rape of a child, alleged Defendant committed the offense "on or about March 10, 2021, through March 20, 2021." Although evidence concerning two child rapes was presented to the jury, the evidence established only one of the rapes could have occurred during the period alleged in the indictment: the rape which the victim said occurred about a week before her March 22, 2021 forensic interview. The proof regarding the first rape established that it occurred while the victim was still ten years old, which meant that it occurred before March 5, 2021, and outside the time frame alleged in Count 1.[6] Because the evidence was clear as to the offense that was the subject of Count 1, no election was required.

In Count 2, Defendant was charged with continuous child sexual abuse occurring "on or about May 2020 to March 2021." As relevant to this case, "A person commits continuous sexual abuse of a child who . . . [o]ver a period of ninety (90) days or more,

---

[6] Had the evidence suggested that the first rape could have occurred during the time frame set forth in Count 1, then the State would have been required to elect. *See, e.g.*, *State v. Brown*, 992 S.W.2d 389, 392 (Tenn. 1999) (concluding that trial court erred in failing to require election when the defendant was charged with rape of a child in a single-count indictment covering a six-month time frame and proof at trial established at least ten instances of digital penetration which occurred during period alleged in indictment).

engages in multiple acts of sexual abuse of a child[.]" Tenn. Code Ann. § 39-13-518(b)(1). "Multiple acts of sexual abuse of a child," as relevant here, involves "[e]ngaging in three or more incidents of sexual abuse of a child involving the same minor child on separate occasions." *Id.* § 39-13-518(a)(1)(A)(i). Rape of a child and aggravated sexual battery are two of the several offenses which constitute "sexual abuse" for purposes of this statute. *See id.* § 39-13-518(a)(2)(C)-(D). The jury must unanimously agree upon the predicate acts, and that they occurred within the time frame alleged in the indictment. *See id.* § 39-13-518(e)(1)(A), (e)(2). Although the statute mandates that "the jury unanimously agree that Defendant committed three or more acts of sexual abuse of [a] child during a period longer than ninety days, there is no requirement for the jury to specify which three acts they relied on to support Defendant's continuous sexual abuse of a minor conviction." *State v. Cox*, No. E2020-01388-CCA-R3-CD, 2022 WL 325596, at *19 (Tenn. Crim. App. Feb. 3, 2022), *perm. app. denied* (Tenn. June 8, 2022).

Of note, the statute contains the following two subsections:

(d) At least thirty (30) days prior to trial, the state shall file with the court a written notice identifying the multiple acts of sexual abuse of a child upon which the violation of this section is based. The notice shall include the identity of the victim and the statutory offense violated. Upon good cause, and where the defendant was unaware of the predicate offenses listed in the notice, the trial court may grant a continuance to facilitate proper notification of the incidents of sexual abuse of a child and for preparation by the defense of such incidents specified in the statement.

. . . .

(f) The state may charge alternative violations of this section and of the separate offenses committed within the same time period. The separate incidents shall be alleged in separate counts and joined in the same action. A person may be convicted either of one (1) criminal violation of this section, or for one (1) or more of the separate incidents of sexual abuse of a child committed within the county in which the charges were filed, but not both. The state shall not be required to elect submission to the jury of the several counts. The jury shall be instructed to return a verdict on all counts in the indictment. In the event that a verdict of guilty is returned on a separate count that was included in the notice of separate incidents of sexual abuse of a child and the jury returns a verdict of guilty for a violation of this section, at the sentencing hearing the trial judge shall merge the separate count into the conviction under this section and only impose a sentence under this section.

- 10 -

Tenn. Code Ann. § 39-13-518(d), (f).[7]

The record indicates that on April 14, 2022, the State filed notice per subsection (d). The notice identified four predicate offenses: two counts of rape of a child, Tennessee Code Annotated section 39-13-522, and two counts of aggravated sexual battery, section 39-13-504. The notice named the victim and cited to the relevant statutory provisions. The facts of the four charged acts were not listed in the State's notice, but the statute does not require such facts to be listed in the notice, nor did Defendant file a motion for bill of particulars or other relief. Thus, the notice was sufficient. The four incidents of sexual abuse recounted throughout this opinion were the only four incidents of sexual abuse presented to the jury, and the statutory language did not require the State to elect which offenses were applicable to the continuous child sexual abuse charge. Thus, Petitioner's claim that the State was required to elect offenses for the continuous child sexual abuse count is without merit.

In consideration of the above, we conclude that no clear and unequivocal rule of law was violated relative to election of offenses. Similarly, we conclude that Defendant has failed to establish the trial court's actions adversely affected Defendant's rights, nor is consideration of the election issue necessary to do substantial justice. Thus, Defendant is not entitled to plain error relief on this issue.

## B. Modified Unanimity Instruction

Similarly, Defendant contends the trial court erred in failing to give a special jury instruction on modified unanimity; this instruction, he contends, failed to ensure a unanimous verdict. However, Defendant did not move for such an instruction, so the issue is waived on appeal. *See* Tenn. R. App. P. 3(b), 36. Even if not waived, however, Defendant would not be entitled to plain error relief. As stated above, in *Cox* we held that although the continuous child sexual abuse statute requires the "jury [to] unanimously agree that Defendant committed three or more acts of sexual abuse of [a] child during a period longer than ninety days, there is no requirement for the jury to specify which three acts they relied on to support Defendant's continuous sexual abuse of a minor conviction." 2022 WL 325596, at *19. Citing to an opinion of the Tennessee Attorney General, we added in *Cox*:

[T]he statute "merely requires the jury unanimously find that a requisite number of acts of sexual abuse of one or more children occur within a defined

---

[7] In this case, the judgment forms reflect that "Count 1 merges into Count 2." Thus, consistent with the statute, the sole judgment of conviction in this case is for Count 2, which charged Defendant with continuous child sexual abuse.

time frame," and that "the requirement of jury unanimity does not preclude a conviction where the jury does not agree as to which acts took place so long as it unanimously agrees that the defendant performed the requisite number of acts during the necessary time period."

*Id*. (citing Tenn. Op. Att'y Gen. No. 13-35 (2013)).

The jury in this case was instructed that its opinion must be unanimous, and the jury is presumed to follow the trial court's instructions. *State v. Williams*, 977 S.W.2d 101, 106 (Tenn. 1998). In sum, there was no requirement for the trial court to issue a modified jury unanimity instruction to ensure that the jury's verdict was unanimous in this case. Thus, no unequivocal rule of law was breached, and Defendant is not entitled to plain error relief on this issue.

## C. Sufficiency of Evidence

Defendant argues the evidence produced at trial was insufficient to sustain his convictions for rape of a child and continuous child sexual abuse. We disagree.

### 1. Standard of Review

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). This standard of review is identical whether the conviction relies on direct evidence, circumstantial evidence, or a combination of both. *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal, therefore, the burden is shifted to the defendant to prove why the evidence is insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id.* at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d

405, 410 (Tenn. 1990). Consequently, we are precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

## 2. Rape of a Child

As relevant to this case, "Rape of a child is the unlawful sexual penetration of a victim by the defendant . . . if the victim is more than eight (8) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (eff. July 1, 2020).[8] Our criminal code defines "sexual penetration," as relevant to this case, as "sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body . . . into the genital or anal openings of the victim's . . . body[.]" *Id.* § 39-13-501(8).

At trial the victim testified that during the offense in question, Defendant grabbed the victim, placed her on his bed, and removed her clothes. Defendant then penetrated the victim's vagina with his fingers, which he moved inside the victim's vagina, while simultaneously fondling his penis and making "noises." The victim testified the Defendant's actions hurt her, and when she told the Defendant he was hurting her, he stopped. The victim testified this attack happened about one week before her forensic interview with Ms. Edge, which took place March 22, 2021. Dr. Piercey testified that the victim told her that the offense occurred on March 17, 2021. The victim was eleven years old at the time, and the dates set forth by the victim fall within the date range alleged in the indictment of "on or about March 10, 2021, through March 20, 2021."

Defendant takes exception to the lack of physical evidence to substantiate the offenses for which he was convicted, but Tennessee's appellate courts have long held that even in rape cases, "a defendant may be convicted upon the uncorroborated testimony of one witness." *State v. Wyrick*, 62 S.W.3d 751, 767 (Tenn. Crim. App. 2001). The accredited "testimony of a victim, by itself, is sufficient to support a conviction." *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993) (citing *State v. Williams*, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)). The jury in this case, through its verdict, accredited the victim's testimony concerning the Defendant's attack. This testimony, by itself, was sufficient to establish that Defendant committed the offense, and to find Defendant guilty of rape of a child beyond a reasonable doubt.

---

[8] The indictment in this case quotes the former language of the rape of a child statute, which penalized the unlawful penetration of a victim "more than three (3) years of age but less than thirteen (13) years of age." However, because the eight-year-old victim age provision became effective July 1, 2020, and the indictment alleged the offense occurred "on or about March 10, 2021, through March 20, 2021," the indictment should have quoted the language of the current statute. This discrepancy is not fatal to the indictment, however, as the indictment cited to the proper statute. We also note the victim was older than age eight at the time of the offense.

- 13 -

### 3. Continuous Child Sexual Abuse

As stated above, "A person commits continuous sexual abuse of a child who . . . [o]ver a period of ninety (90) days or more, engages in multiple acts of sexual abuse of a child[.]" Tenn. Code Ann. § 39-13-518(b)(1). "Multiple acts of sexual abuse of a child" involves, as charged in this case, "Engaging in three or more incidents of sexual abuse of a child involving the same minor child on separate occasions[.]" *Id.* § 39-13-518(a)(1)(A)(i).

Rape of a child and aggravated sexual battery are two of the several offenses which constitute "sexual abuse" for purposes of this statute. *See id.* § 39-13-518(a)(2)(C)-(D). The elements of rape of a child are set forth earlier in this opinion. In relevant part, "Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim" when the "victim is less than thirteen (13) years of age." *Id.* § 39-13-504(a)(4). "Sexual contact" is defined as:

> [T]he intentional touching of the victim's [or] the defendant's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's [or] the defendant's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification.

*Id.* § 39-13-501(6). "'Intimate parts' includes the primary genital areas, groin, inner thigh, buttock, or breast of a human being." *Id.* § 39-13-501(2).

Here, the evidence established four acts of "sexual abuse" for purposes of the continuous child sexual abuse statute: two incidents of rape of a child and two incidents of aggravated sexual battery. All four acts occurred in the victim's home, into which she, her mother, and sister moved in March or April 2020. The first instance of sexual abuse occurred when the victim was ten years old, when Defendant entered the victim's room as she was lying under the covers on her bed, placed his hands down her shirt, and squeezed her breasts. This action constituted aggravated sexual battery. In the second instance of sexual abuse, Defendant raped the victim in his room by placing his hand inside the victim's vagina and moving his finger "in a circle." In the third instance of sexual abuse, after the victim went into Defendant's room to look for cookies, Defendant pushed her onto the bed and forced her hand onto his penis, which was covered by clothing. This act constituted aggravated sexual battery. The victim testified the first three incidents of sexual abuse (all of which occurred when she was ten years old) happened after an incident in fall 2020 in which Defendant forced the victim against the wall and kissed her. The most recent event, Defendant's March 17, 2021 rape of the victim, is detailed above.

- 14 -

One matter is worth noting for the second instance of sexual abuse. As stated elsewhere in the opinion, the proof established the victim did not move into the house where the offenses occurred until March or April 2020. While the victim was unsure of the date, and said it could have occurred in Spring 2019, she told the interviewer that this incident occurred when she was ten years old. Despite this inconsistency, we observe, as does the State in its brief, that "[t]he credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact." *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008).

Considering the victim's testimony that the four instances of sexual abuse occurred after Defendant first kissed her in the fall of 2020, along with Defendant's testimony that he did not move into the victim's house on a full-time basis until October 4, 2020, the jury could reasonably infer that the sexual abuse occurred over a period between fall 2020 and March 17, 2021—a period of more than ninety days. Thus, the evidence was sufficient to establish, beyond a reasonable doubt, that Defendant committed continuous sexual abuse against the victim. He is not entitled to relief on this issue.

IV. Conclusion

For the above-stated reasons, we affirm the judgment of the trial court.

_____
MATTHEW J. WILSON, JUDGE

- 15 -